**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**BUTCH BRIAN LOCKHART,**

      **Plaintiff,**

**v.**                                        **Case No.: 1:16-cv-05216**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,[1]**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Summary Judgment and supporting memorandum, (ECF Nos. 11, 12), and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF No. 13).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, to the extent that is requests remand of the Commissioner's decision; that the Commissioner's motion for judgment on the pleadings be **DENIED**; that the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On June 6, 2013, Plaintiff Butch Brian Lockhart ("Claimant") protectively filed an application for DIB and SSI, alleging a disability onset date of November 1, 2010,[2] due to high blood pressure, congestive heart failure, panic attacks, atrial fibrillation, sleep apnea, lower back pain, problems with his left leg, anxiety, heart problems, thyroid problems, and stomach problems. (Tr. at 241, 243, 269). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 156-167, 171-178). Claimant subsequently filed a request for an administrative hearing. (Tr. at 179). A hearing was held on October 27, 2014 before the Honorable Joseph Scruton, Administrative Law Judge ("ALJ"). (Tr. at 31-64). By written decision dated January 30, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-25). The ALJ's decision became the final decision of the Commissioner on April 29, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

---

[2] Claimant's date of disability onset was amended to March 14, 2013 based upon a prior decision by the Commissioner denying him SSI and DIB. As the ALJ noted, Claimant previously filed SSI and DIB applications alleging disability beginning November 1, 2010. These applications were denied by written decision dated March 13, 2013. (Tr. at 13). Claimant did not appeal the decision. Consequently, applying the principle of *res judicata*, the ALJ confined his analysis to the question of Claimant's disability during the period beginning on March 14, 2013, the day after the last decision, through January 30, 2015, the date of the written decision currently in dispute. (*Id.*).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Thereafter, Claimant filed a Motion for Summary Judgment and Memorandum in Support, (ECF Nos. 11, 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13). The time period within which Claimant could file a reply has expired; consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 42 years old at the time of the amended disability onset date and 44 years old on the date of the ALJ's decision. (Tr. at 13). He communicates in English and has at least a high school education. (Tr. at 268, 270). Claimant previously worked as a carpenter for a business that sold mobile homes. (Tr. at 270).

## III.    Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe

impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically

determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for DIB through December 31, 2012. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 13, 2013, the date of his prior decision. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "cardiovascular disease (with a history of cardiomyopathy and atrial fibrillation); obesity; lumbar spine degenerative disc disease; hypertension; obstructive sleep apnea partially controlled with the use of bi-pap unit; bilateral

5

osteoarthritis of the knees and generalized arthritis; depressive and anxiety disorders; and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c))." (Tr. at 16-19, Finding No. 3). The ALJ stated that he considered Claimant's other impairments to be non-severe. (Tr. at 16).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-19, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift and/or carry up to 10 pounds, stand and/or walk for 2 hours out of an 8-hour workday, and sit for 6 hours out of an 8-hour workday. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. However, the claimant must avoid moderate exposure to all pulmonary and respiratory irritants, and must avoid extreme temperatures and excessive humidity. The claimant is capable of frequent, but not constant, handling, fingering, feeling, and reaching. Due to his mental impairments, the claimant must avoid large crowds and have no public interaction requirements, but is able to interact appropriately with supervisors and co-workers. The claimant is able to understand, remember, and carry out short simple work instructions.

(Tr. at 19-23, Finding No. 5). At the fourth step, the ALJ found that through the date last insured, Claimant was unable to perform any past relevant work. (Tr. at 24, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 24-25, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1970, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that

6

Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 24, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a final assembler, compact assembler, and addresser in the unskilled sedentary exertional level. (Tr. at 24-25, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV. **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ failed to properly analyze the evidence concerning Claimant's mental impairments, chronic pain and fatigue, and ability to use his hands. (ECF No. 12 at 15-21). In particular, Claimant contends that the ALJ improperly weighed the RFC assessment provided by Mr. Lawson, Claimant's treating psychologist, and misconstrued Mr. Lawson's clinical notes. Claimant adds that the ALJ failed to fairly evaluate Claimant's credibility and failed to explain the basis for the limitations in the RFC finding related to the arthritis in Claimant's hands. In response, the Commissioner asserts that the ALJ properly evaluated and weighed the opinion of Claimant's treating psychologist, fairly assessed Claimant's credibility, and fully accounted for Claimant's alleged hand impairment in accordance with Social Security rules and regulations. (ECF No. 13 at 9-18).

## V. **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to the disputed issues are summarized as follows.

### A. Treatment Record

Prior to the relevant period, Claimant was evaluated and treated for back pain that sometimes radiated into his leg. Testing and examination showed evidence of degenerative changes and a lumbosacral musculoligamentous strain. (Tr. at 391-92, 443, 589, 591, 593, 597). Claimant was also treated for hypertension and hyperlipidemia and was advised to exercise and lose weight, as he suffered from morbid obesity. (Tr. at 398, 745, 760-61).

In February 2013, Claimant presented to psychologist David B. Lawson, M.A., at Lantern Mental Health, Inc. Claimant reported suffering from constant nervousness, adding that he had always been a nervous person, but his symptoms were worse lately. (Tr. at 569). His hobbies included playing cards with his children and playing video games. Claimant also took care of his own personal needs and some household chores. (Tr. at 574). Mr. Lawson diagnosed Claimant with major depressive disorder, generalized anxiety disorder, and panic disorder without agoraphobia. (Tr. at 575).

In March 2013, Claimant had a follow-up visit with his internist, Jose Oyco, M.D. Claimant reported having panic attacks three to four times per month when he was stressed or upset, which were accompanied by shortness of breath. (Tr. at 570). He also reported "sometimes" suffering deep depression that lasted three to five hours. (Tr. at 570). His mood was dysphoric and nervous; his affect was restricted; and his thought processes were concrete. (Tr. at 573).

The following month, Claimant had another visit with Mr. Lawson. Claimant's mental status was normal, but he rated his depression 4 out of 10 and his anxiety 8 out of 10. (Tr. at 568). He reported increased anxiety and panic. Mr. Lawson observed Claimant to appear very anxious, with poor eye contact and shaking of his legs. (*Id.*). Mr. Lawson

8

felt that Claimant's prognosis was poor based upon his presentation.

Later that same month, Claimant presented to the hospital with shortness of breath and chest tightness. (Tr. at 420, 461). He underwent a cardiac catheterization on April 29, 2013 and was discharged the following day. Claimant's diagnoses included false positive stress test; atrial fibrillation now converted to sinus rhythm; hypertension; dyslipidemia; anxiety; morbid obesity; clinical sleep apnea; elevated liver function tests, probably secondary to fatty liver; and acute chronic kidney disease, now improved. (*Id.*). Claimant was told to resume activity as tolerated, follow a cardiac diet, see his cardiologist in two to three weeks, and see his primary care provider in a month. (Tr. at 462). At that time, Claimant had fair range of motion in all joints. (Tr. at 465). However, he stated that he was "disabled due to anxiety and sore feet." (Tr. at 481).

In May 2013, Claimant had an orthopedic re-examination by Robert P. Kropac, M.D. Claimant reported that his lower back pain was still constant and was exacerbated primarily by bending and stooping and, to some extent, by prolonged sitting. (Tr. at 586). He also had some radiation of pain in his left leg with occasional numbness. (*Id.*). Overall, the pain was relieved somewhat with the use of medications, which allowed him to be more functional and social than he would be otherwise given his lower back condition. (*Id.*). Dr. Kropac diagnosed Claimant with lumbosacral musculoligamentous strain with the need to rule out a disc herniation. (Tr. at 587). Claimant was to continue taking Ultram for pain and Motrin for its anti-inflammatory effect. (*Id.*). He was also to begin a course of physical therapy three times per week for four weeks and then return to Dr. Kropac for re-evaluation. (*Id.*).

On May 15, 2013, Claimant had a cardiology follow-up with Dr. Ugoala Banks. Claimant had no new complaints and stated that he felt fine. (Tr. at 603). He had no chest,

abdominal, or musculoskeletal pain. (*Id.*). Dr. Banks's impression was status post left heart catheterization, chest pain, shortness of breath, edema, and bi-polar disease. (Tr. at 603-04).

During his visit with Mr. Lawson in May, Claimant was oriented in all spheres and his sensorium, eye contact, and gait were within normal limits. (Tr. at 567). He still rated his depression 4 out of 10 and his anxiety 8 out of 10. (*Id.*). Claimant was noted to be very anxious with poor eye contact, and he had to be reoriented to questions or statements. (*Id.*). Mr. Lawson and Claimant discussed, and also practiced, relaxation breathing. (*Id.*). Claimant's prognosis continued to be poor. (*Id.*).

In July 2013, Claimant had another cardiology appointment. He complained of "feeling sleepy," having difficulty sleeping at night, and knee pain. (Tr. at 601). He denied abdominal or musculoskeletal pain. (*Id.*). Dr. Banks's diagnoses included obstructive sleep apnea, uncontrolled hypertension, hypoxemia, and obesity. (Tr. at 602). He recommended a continuous positive airway pressure ("C-PAP") machine based on the results of Claimant's sleep study results. (*Id.*).

In August, Claimant again saw Mr. Lawson. Claimant reported that his depression and anxiety were the same severity, but Mr. Lawson documented that Claimant was making better eye contact. (Tr. at 582). Claimant also saw Dr. Kropac in August and September 2013. (Tr. at 584 and 617). His reported symptoms, diagnosis, and treatment plan remained the same. (*Id.*).

In October 2013, psychological testing from Mr. Lawson showed that Claimant had major depressive disorder, generalized anxiety disorder, and panic disorder. (Tr. at 613). Mr. Lawson recommended that Claimant continue with treatment and undergo monitoring for an increase in symptom severity. (*Id.*). The following month, Claimant

reported anxiety and frustration due to problems with his ex-wife over their childcare schedule. (Tr. at 606). He appeared very anxious. (*Id.*).

In December 2013, Claimant reported to Dr. Kropac that his lower back condition was the same, but he had increasing knee pain. (Tr. at 615). Although he still reported pain, he said it was more tolerable with the use of medications. (*Id.*). Dr. Kropac diagnosed Claimant with lumbar disc protrusion without radiculopathy and chronic osteoarthritis in his knees. (Tr. at 616). He was told to continue taking Ultram and Motrin and return in three months. (*Id.*). No other treatment was recommended. (*Id.*).

The following month, Claimant saw Mr. Lawson. Claimant rated his depression and anxiety 5 out of 10. (Tr. at 621). He stated that his anxiety had lessened and he felt relief that the holiday season stress had abated; however, he appeared anxious. (*Id.*). During his February 2014 visit with Dr. Kropac, Claimant stated that his lower back pain was becoming progressively worse and he also suffered from knee pain and radiation of pain and numbness in his left leg. (Tr. at 627). His diagnoses remained the same. (Tr. at 628). Claimant received an injection of Naropin and Betamethasone in his left knee. (*Id.*). He was to continue Ultram and Motrin and return in three months. (*Id.*).

In April 2014, Claimant's depression and anxiety were the same. Mr. Lawson noted that Claimant appeared nervous and was breathing audibly, sweaty, and fidgety. (*Id.*). Claimant reported poor sleep, anxiety, and stress related to various issues, including bills. (*Id.*). The same month, Claimant saw Maria R. Boustani, M.D., for evaluation of sleep apnea. (Tr. at 799). He reported that he frequently took off his bi-level positive airway pressure (Bi-PAP) machine. (*Id.*). He also stated that he gained a significant amount of weight since he stopped working. Claimant indicated that he used to be a carpenter and weighed 180 pounds when he graduated from high school as opposed to his current 369

11

pounds. (*Id.*). He stated that he rode a treadmill and bike for one hour every day for weight reduction. (*Id.*). He did not appear to be in distress. (Tr. at 800). Dr. Boustani assessed Claimant with sleep apnea and instructed him to focus on compliance and weight loss. He also suffered from atrial fibrillation related to sleep apnea; osteoarthritis worsened by morbid obesity, which might require gastric bypass surgery; and very poorly controlled hypertension. (*Id.*).

In May 2014, Claimant reported to Dr. Kropac that his back condition was the same. (Tr. at 625). His diagnoses were unchanged. (Tr. at 626). Dr. Kropac instructed Claimant to take hydrocodone and referred him for evaluation of possible total knee arthroplasty. Claimant was instructed to return for follow-up in three months. (*Id.*).

In June 2014, Claimant saw Mr. Lawson and his depression and anxiety were still 5 out of 10. (Tr. at 619). Claimant again seemed nervous, was breathing audibly, and was sweaty and fidgety. (*Id.*). He reported sleeping somewhat better, but was experiencing social withdrawal and avoidance. (*Id.*). The same month, Claimant followed up with Dr. Boustani for pulmonary issues. (Tr. at 798). She assessed Claimant with morbid obesity, for which he was advised to lose weight, and sleep apnea for which he was not completely compliant with his Bi-PAP machine. (*Id.*). No changes were made to his medications. (*Id.*).

In July 2014, Claimant presented to orthopedist, Philip J. Branson, M.D, with bilateral knee pain that was significantly worse on the left. (Tr. at 795). Claimant had lost 50 pounds, and his BMI was now 40. (*Id.*). He stated that his knee pain developed over the course of years, but was marginally worse in the past two years. (*Id.*). Dr. Branson diagnosed Claimant with significant varus arthritis in both knees, worse in the left, and exogenous obesity. (*Id.*). He referred Claimant for an MRI to determine whether surgery

would be beneficial and to evaluate the other treatment options. (Tr. at 796).

In August 2014, Claimant followed up with Dr. Kropac. Claimant's complaints had not changed, and his diagnoses remained the same. (Tr. at 623-24). Dr. Kropac instructed Claimant to continue taking Ultram, begin physical therapy for his knee, and return for re-evaluation in four weeks. (*Id.*). On the same date, Claimant underwent a barium swallow and upper gastrointestinal study to investigate complaints of right upper quadrant pain, nausea, and vomiting. (Tr. at 806). The test results showed a duodenal diverticulum approximately 5 cm in size and a small sliding type hiatal hernia without significant complicating features. (*Id.*).

In September, Claimant saw Dr. Branson regarding left knee arthritis. (Tr. at 794). Dr. Branson injected Claimant's left knee with Naropin and Bethamethasone. (*Id.*). Dr. Branson advised Claimant that his treatment options included simply continuing to live with the problem or having knee surgery. (*Id.*). Claimant stated that he did not feel capable of living with his knee in its current condition. (*Id.*).

The following month, Claimant again saw Dr. Branson, who stated that Medicaid inappropriately denied certification for his left knee MRI. (Tr. at 813). Dr. Branson advised that Claimant had severe, end stage arthritis in both knees. (*Id.*). He felt that the decision-making in the case was clear-cut, as Claimant had extensive medical records demonstrating satisfactory indications for surgery. (*Id.*). Dr. Branson planned to resubmit a request for a MRI, while Claimant continued his efforts to lose weight. At that point, he had lost approximately 60 pounds. (*Id.*).

In November 2014, Claimant saw Dr. Boustani for follow up regarding pulmonary issues. She noted that he was "not doing well" due to significant arthritic pain and occasional inability to sleep. (Tr. at 815). In addition to his knees, he reported pain in his

fingers and back. (*Id.*). Claimant stated that he was "miserable," mostly from arthritic pains. (*Id.*). Dr. Boustani diagnosed Claimant with shortness of breath on exertion; morbid obesity; and sleep apnea for which he was urged to always use the C-PAP, as he had not been fully compliant with doing so. (*Id.*).

In January 2015, Claimant saw Wassim S. Saikali, M.D., a rheumatologist, at the referral of Dr. Boustani. Dr. Saikali performed an examination of Claimant that was suggestive of severe osteoarthritis of the knees and back, which was exacerbated by morbid obesity. (Tr. at 822). Dr. Saikali did not believe Claimant had rheumatoid arthritis, but felt he could have mild inflammatory metabolic osteoarthritis, despite a lack of visible evidence of that condition. (*Id.*). Dr. Saikali explained to Claimant that without significant weight loss, Claimant's treatment options were minimal. (*Id.*). Claimant advised that Lortab had been helpful in the past, but Dr. Kropac had stopped prescribing it to him. (*Id.*). Dr. Saikali likewise declined to write him a prescription for Lortab. (*Id.*).

### B. Evaluation and Opinion Evidence

In July 2013, Philip E. Comer, Ph.D., completed a Psychiatric Review Technique based upon his analysis of Claimant's records. He assessed Claimant with severe affective and anxiety disorders. (Tr. at 78). Dr. Comer found Claimant to have mild restriction in activities of daily living; moderate restriction in social functioning and concentration, persistence, or pace; and one or two episodes of decompensation of extended duration. (Tr. at 79). He opined that Claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length

14

of rest periods; interact with the general public; and respond appropriately to changes in the work setting. (Tr. at 82-83). He found Claimant's statements to be reasonably consistent with the treatment records and credible; however, he opined that Claimant had the mental/emotional capacity for simple routine work activity in an environment that required limited social interaction and that did not require sustained concentration. (Tr. at 84). These findings were reviewed and affirmed by John Todd, Ph.D., at the reconsideration level of Claimant's claim in September 2013. (Tr. at 106, 111).

Also in July 2013, Rabah Boukhemis, M.D., assessed Claimant's physical RFC based upon his review of Claimant's records. He opined that Claimant was capable of medium work with additional postural and environmental limitations, but with no manipulative limitations. (Tr. at 80-81). Dr. Boukhemis opined that Claimant could work as a meat clerk, porter/bagger, and rug-cleaner helper. (Tr. at 85). Rogelio Lim, M.D., affirmed these findings in September 2013. (Tr. at 109, 112).

In October 2014, Claimant's psychologist, Mr. Lawson, completed a form regarding Claimant's ability to do work-related activities. On a scale of "none, mild, moderate, marked, and extreme," he found Claimant to be moderately impaired in his ability to remember locations and work-like procedures; understand and remember short, simple instructions; and sustain an ordinary routine without special supervision. (Tr. at 802). He assessed Claimant to be markedly impaired in his ability to carry out short, simple instructions; understand and remember detailed instructions; interact appropriately with supervisor(s); and respond appropriately to changes in a routine work setting. (Tr. at 802-03). Further, Mr. Lawson opined that Claimant was extremely impaired in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain

15

regular attendance, and be punctual; work with or near others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek; perform at a consistent pace; interact appropriately with the public or co-workers; and respond appropriately to work pressures in a usual work setting. (*Id.*). Mr. Lawson stated that Claimant's psychological testing and behavioral observations suggested extreme anxiety and panic. (Tr. at 803). For further support, he referred to his records reflecting Claimant's psychiatric treatment and testing. (Tr. at 803-04).

## VI.  **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

### A. Psychological Impairments

As his first challenge to the Commissioner's decision, Claimant contends that the ALJ did not correctly analyze and apply evidence regarding his mental impairments. (ECF No. 12 at 15). Specifically, Claimant argues that the ALJ failed to give proper weight to Mr. Lawson's RFC assessment and misinterpreted his clinical notes. In addition, Claimant alleges that the ALJ failed to provide a reasonable explanation for his determination of Claimant's RFC.

The ALJ found at step three of the sequential evaluation that Claimant had "mild to moderate" limitations in social functioning and maintaining concentration, persistence, or pace and had no episodes of decompensation of extended duration. (Tr. at 18). Before proceeding to step four, the ALJ ascertained Claimant's RFC, reviewing the treatment notes and medical source opinions. The ALJ noted that Claimant's treating psychologist, Mr. Lawson, opined that Claimant had "no useful ability" to, *inter alia*, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, work with or near others without being distracted by them, perform at a consistent pace, interact appropriately with co-workers, or respond appropriately to work pressures in a usual work setting. (Tr. at 22). The ALJ gave little weight to Mr. Lawson's opinion for several reasons, including the fact that it was not consistent with or supported by his treatment notes. (Tr. at 23). The ALJ also examined the opinions of the state agency psychologists, indicating that these medical sources found that Claimant's mental impairments would not preclude him from performing unskilled work activity. (*Id.*). Nonetheless, the ALJ added:

The undersigned considered the updated medical records received since the

17

> [RFC] assessments were made by these medical consultants, but new evidence reveals that the claimant is somewhat more limited than previously determined by these consultants. Thus, because this opinion evidence is somewhat consistent with the objective evidence as a whole it is given some weight to the extent the claimant is limited to unskilled work activities.

(Tr. at 23). The ALJ ultimately concluded that "due to his mental impairments, the claimant must avoid large crowds and have no public interaction requirements;" however, the ALJ found that Claimant could "interact appropriately with supervisors and co-workers" and "understand, remember, and carry out short simple work instructions." (Tr. at 19).

The undersigned finds the ALJ's analysis of the medical source opinions and other evidence concerning Claimant's mental impairments to be inadequate. The ALJ failed to explain and resolve significant inconsistencies in the evidence; thus, preventing meaningful review by this Court. For example, the ALJ never articulated an evidentiary basis for his determination that Claimant had "mild to moderate" limitations in social functioning and maintaining concentration, persistence, or pace and had no episodes of decompensation, which were of extended duration. Such an explanation was necessary given the reports of Claimant's treating psychologist and the state agency psychologists, who collectively opined that Claimant was at least moderately limited in the foregoing functional areas and had one to two episodes of decompensation of extended duration. (Tr. at 79, 106, 802-03).

With respect to Claimant's deficits in social functioning, maintaining concentration, persistence, or pace, the ALJ stated later in the decision that he gave little weight to Mr. Lawson's opinions and only some weight to the agency experts' opinions. (Tr. at 23). While assigning weight to the medical source opinions was clearly important,

completing that task did not obviate the need for an explanation of the RFC finding; particularly as the RFC finding diverged in significant ways from the opinions. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations"). Similarly, the ALJ failed to provide any explanation for his conclusion that Claimant had no episodes of decompensation despite contrary conclusions by the medical sources. Certainly, the ALJ may have concluded that the episodes alluded to by the medical sources were not of sufficient duration. However, the Court is left to speculate about the ALJ's rationale, because he did not elaborate at all on that finding. (Tr. at 18). Overall, the ALJ failed to provide an evidentiary basis for his RFC finding, making it is impossible for the Court to discern whether his conclusion concerning the functional impact of Claimant's mental impairments is supported by substantial evidence.

Moreover, the ALJ's lack of explanation cannot be deemed harmless error in this case for several reasons.[3] First, given the discrepancy between the ALJ's RFC finding and the evidence, the ALJ was required to resolve the conflicts, articulate his analysis, and cite

---

[3] Courts have applied a harmless error analysis in the context of Social Security appeals. One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by [claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *See, also, Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

evidentiary support for his conclusions. SSR 96-8p, 1996 WL 374184, at *7 (the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). Further, the ALJ stated that he relied upon the agency experts' opinions that Claimant could perform unskilled work; however, the experts clarified that Claimant could only perform such work in an environment that required no sustained concentration. The ALJ did not even acknowledge that caveat, much less incorporate any corresponding restriction into Claimant's RFC. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (a limitation to simple, routine tasks or unskilled work does not account for a claimant's limitations in concentration, persistence, and pace because the ability to perform simple tasks differs from the ability to stay on task). Finally, the vocational expert testified that the ability to concentrate, pay attention, and maintain a pace were critical requirements to perform the sedentary jobs that the expert identified in response to the ALJ's hypothetical. (Tr. at 63). For all of those reasons, Claimant's ability to maintain concentration, persistence, and pace was pivotal to the definitive issue of whether Claimant was capable of gainful employment.

Ultimately, what is lacking in the ALJ's decision is his analysis of Claimant's mental impairments, the functional effects of such impairments, and a logical bridge between the ALJ's analysis of the evidence and the ALJ's conclusions. While the ALJ may have been able to explain the inconsistencies cited above and provide support for his decision, the Court "cannot begin to engage in a 'meaningful review' when there is nothing on which to base a review." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). As stated in *Fox, supra*, "[o]ur circuit precedent makes clear that it is not [the Court's] role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Id.*

Therefore, because the ALJ's RFC discussion lacks a sufficient explanation of Claimant's mental limitations and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider, or elaborate on the discussion of, Claimant's mental impairments and functional limitations.

### B. Pain and Fatigue

Claimant next argues that the ALJ failed to appropriately consider his "chronic pain and fatigue." (ECF No. 12 at 19). Pursuant to 20 C.F.R. § 404.1529, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from

performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical

22

evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

"[I]t is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether

the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Because the undersigned has recommended that this case be remanded for the above reasons, a detailed discussion of Claimant's second challenge is unnecessary. Nevertheless, the undersigned concludes that the ALJ's analysis of Claimant's pain and fatigue complied with the applicable Regulation and Ruling. The ALJ considered the objective medical evidence, opinion evidence, Claimant's treatment records, Claimant's alleged symptoms, and Claimant's statements regarding his abilities and activities. (Tr. at 20-23). The ALJ analyzed the consistency of Claimant's allegations when compared with the clinical observations and findings, his reported daily activities, and the nature of Claimant's treatment. (*Id.*). In assessing Claimant's statements regarding his symptoms, the ALJ articulated his reasoning that Claimant's statements were not entitled to full

24

weight. The ALJ was not required to explicitly discuss each factor described in 20 C.F.R. § 404.1529(c) or SSR 16-3p; instead, the ALJ was obliged to supply logical reasons grounded in substantial evidence to support the weight that he assigned to Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms. *See Bailey*, 2015 WL 9595499, at \*19; *Murdock v. Colvin*, No. 5:14CV40, 2014 WL 9866441, at \*3 (W.D.N.C. Nov. 19, 2014). Ultimately, the ALJ did just that. Therefore, the undersigned **FINDS** that the ALJ's analysis of Claimant's pain and fatigue is supported by substantial evidence.

### C. Hand Impairment

In his final assertion of error, Claimant argues that the ALJ's analysis of the use of his hands is deficient. (ECF No. 12 at 21). The undersigned agrees with this contention. The ALJ found that Claimant had the severe impairment of "generalized arthritis" and concluded that Claimant's RFC was limited to frequent handling, fingering, and feeling. (Tr. at 16 and 19). However, the ALJ failed to explain the basis for these findings anywhere in his decision. It is evident that the ALJ found Claimant to be more limited than the state experts, who found no manipulative limitations. (Tr. at 81 and 108). Nevertheless, while the ALJ's ultimate conclusions regarding Claimant's use of his hands may indeed be more favorable to Claimant and while they may be supported by substantial evidence, it is impossible for the Court to make that determination because the decision fails to provide any insight into the reasoning or evidence for such finding. Again, the Court cannot engage in meaningful review when there is no explanation to review. Therefore, the undersigned **FINDS** that this case must be remanded on the additional basis that the ALJ should elaborate on the analysis and findings regarding Claimant's use of his hands.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for summary judgment, (ECF No. 11), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party,

Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** March 21, 2017

Cheryl A. Eifert
United States Magistrate Judge